IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

FILED
2016 MAY 13 AM 9: 17
CLERK US DISTRICT COURT
WESTERN DISTRICT
BY_____
DEPUTY

STATE FARM FIRE AND CASUALTY
COMPANY,

               **Plaintiff,**

-vs-                                             **Case No. A-14-CA-1105-SS**

CLAYTON J. NEUMAN and JENA
KIRKPATRICK, Individually and as
Representative of the Estate of Ellis McClane,
               **Defendants.**

## O R D E R

       BE IT REMEMBERED on this day the Court reviewed the file in the above-styled cause, and specifically Plaintiff State Farm Fire and Casualty Company's Motion for Full and Final Summary Judgment [#28]; Defendant Jena Kirkpatrick, individually and as representative of the estate of Ellis McClane's Response [#32] in opposition; Plaintiff's Reply [#37] in support; Defendant's Motion for Summary Judgment [#29]; Plaintiff's Response [#31] in opposition; Defendant's Reply [#35] in support; and Defendant Clayton J. Neuman's Motion for Summary Judgment and Response to Plaintiff's Motion for Full and Final Summary Judgment [#33]. Having reviewed the documents, the relevant law, and the file as a whole, the Court now enters the following opinion and orders.

### Background

       This is an insurance coverage dispute arising out of a fatal automobile accident which occurred on November 11, 2011. Defendant Clayton J. Neuman, the driver of the vehicle, was severely injured in the crash. Defendant Jena Kirkpatrick's son, Ellis McClane, one of two



passengers in the car, was tragically killed.  Plaintiff State Farm Fire and Casualty Company filed this action seeking a declaration that no coverage exists for Clayton under his parents' Personal Liability Umbrella Policy (the "Umbrella Policy"), thereby negating its duty to defend or indemnify Clayton in an underlying state tort lawsuit brought by Kirkpatrick.  The sole issue before the Court is whether Clayton is insured under the Umbrella Policy State Farm issued to his parents.

## I.    The Umbrella Policy and Underlying Lawsuit

State Farm issued the Umbrella Policy to Grover and Laura Neuman (the Neumans), Clayton's parents, in September 2009.  The Umbrella Policy was in addition to a related automobile policy (Auto Policy) they had purchased previously.  The Umbrella Policy provides that State Farm will pay on behalf of and defend against any "insured" for damages due to a loss for which the insured is liable and to which the policy applies.  *See* Def.'s Mot. Summ. J. [#29-1] Ex. A (Umbrella Policy) at 14.  The Umbrella Policy defines "insured" as "**you** and **your relatives** whose primary residence is **your** household."  *Id.* at 10.  It is undisputed "**you**" and "**your**" refer to Grover and Laura Neuman—the Named Insureds—and that the Neumans' household, as listed in the Umbrella Policy, is located on Lynncrest Cove in Austin (the Lynncrest House).  *See* Pl.'s Mot. Summ. J. [#28-2] Ex. B (Decls. Page) at 82; *id.* [#28-4] Ex. D (Grover Neuman Dep.) 10:8–13:5.  Consequently, the Umbrella Policy defines "insured" as Grover and Laura Neuman as well as Grover and Laura Neuman's relatives whose primary residence is the Lynncrest House.

On August 29, 2013, Kirkpatrick filed a negligence action against Clayton in state court arising out of the car accident that killed her son.  Clayton sought coverage under the Auto Policy and the Umbrella Policy.  State Farm admitted Clayton was covered under his parents' Auto Policy and has provided him a defense and agreed to indemnify him within the policy limits. *See* Pl.'s Mot.

Summ. J. [#29-4] Ex. D (Stamps Dep.) at 129:20–25.[1]  However, State Farm denied coverage to

Clayton under the Umbrella Policy.  Although it is undisputed Clayton was raised at the Lynncrest

House, State Farm determined Clayton had moved away from home in June 2009 and was residing

in an apartment on West Parmer Lane in Austin (the "West Parmer Apartment") when the accident

occurred. Consequently, State Farm concluded Clayton's "primary residence" was not the Lynncrest

House, and therefore he did not qualify as an "insured" under the Umbrella Policy.  Defendants

concede Clayton was temporarily residing at the West Parmer Apartment, but maintain that his

primary residence for purposes of the Umbrella Policy was the Lynncrest House.

## II.    Clayton's Residence History

Clayton lived with his parents in the Lynncrest House from the time he was born in October

1991 until he graduated high school in June 2009.  Immediately upon graduating, Clayton signed a

year-long lease and moved into an apartment located on U.S. Highway 183 North (the "183

Apartment") in Austin.  Clayton's girlfriend at the time, Sarah Boggess Weaver, and their newborn

daughter, Chloe, moved in with Clayton three months later.  According to Sarah, the couple moved

out of the Lynncrest House because Clayton's parents did not approve of Sarah.  *See* Pl.'s Mot.

Summ. J. [#28-5] Ex. E (Weaver Dep.) at 10:2–5.  In June 2010, Clayton and Sarah were married.

The couple lived together with their daughter in the 183 Apartment for approximately one year, after

which they moved to the Parmer Apartment.

Clayton and Sarah lived together at the Parmer Apartment from August 2010 until April

2011, when Sarah and Clayton separated and Sarah moved back in with her parents.  Clayton

---

[1] The record is not clear on what basis State Farm agreed to defend Clayton under the Auto Policy but declined coverage under the Umbrella Policy.

remained in the West Parmer Apartment and renewed the lease for an additional year in August 2011.  While living at the West Parmer Apartment with Sarah, Clayton was employed as a waiter at a local pizzeria, but after renewing his lease, left his job and enrolled at Austin Community College.  After leaving his job, Clayton received financial assistance from his parents and, although Chloe primarily lived with Sarah and her parents, Clayton maintained custody of his daughter at the West Parmer Apartment for approximately three days per week.  On November 11, 2011, the night of the accident, Clayton had lived at the West Parmer Apartment for approximately fifteen months and had approximately nine months remaining on his renewed lease.  Due to his injuries, Clayton's lease was terminated after the accident and Clayton moved back into the Lynncrest House with his parents.

In the months directly preceding the accident, Clayton admitted to spending most of his time at the West Parmer Apartment.  *Id.* [#28-8] Ex. H (Req. for Admis.) at 5.  Sarah also testified that, before separating, she and Clayton would spend most nights at the West Parmer Apartment and slept over at the Lynncrest House only during the holidays.  *See* Weaver Dep. at 12:8–12, 13:21–24.  According to Clayton's father, Clayton spent the night at the West Parmer Apartment "[a]lmost all the time"; Clayton only visited the Lynncrest House one or twice per week and spent the night approximately once per month.  Grover Neuman Dep. at 30:5–15.  Clayton testified he visited his parents' house "once every couple of weeks" to watch television and so that Chloe could visit with her grandparents.  Clayton Dep at 14:4–10.  Clayton did not significantly contribute to the maintenance, upkeep, taxes or other costs related to the Lynncrest House, but he did occasionally mow the yard and help cook dinner when he was there.  Grover Neuman Dep. at 35:17–36:3.

Clayton kept almost of all of his belongings and items essential for daily living with him at the West Parmer Apartment.  Upon moving out of the Lynncrest House in June 2009, Clayton took with him his bed, his dresser, his stereo, a couch, some bookshelves, his clothes, his computer and other books, games, and toys, and the Neumans began using his former bedroom as a guest room. Clayton also kept the items he used on a daily basis with him at both the 183 Apartment and later the West Parmer Apartment.  For example, Clayton kept his work uniform with him at the West Parmer Apartment, as well as Chloe's baby clothes, baby furniture, baby food, toys, bottles, and other items related to Chloe's care.  Clayton did not maintain his childhood bedroom at the Lynncrest House and he did not leave a significant number of valuable or prized possessions there.  According to Clayton's father, Clayton left only "[m]omentos from childhood and . . . things that he didn't need immediately."  Grover Neuman Dep. [#28] at 16:19–22.

Most of the forms and documents completed by Clayton after moving out of the Lynncrest House bear the 183 Apartment or the West Parmer Apartment addresses.  According to Sarah, Clayton had all of the couple's important mail delivered to the 183 Apartment or West Parmer Apartment, including utility bills and packages related to online purchases.  Weaver Dep. at 14:7–23; Grover Dep. 41:2–7. Clayton listed the West Parmer Apartment address on his various employment documents, including his employer's internal paperwork, his federal W-2 form, and his 2010 tax return. *See* Pl.'s Mot. Summ. J. [##28-7, -11, -13] Exs. K, G, & M.  Clayton and Sarah's 2011 tax return listed Sarah's address. *Id.* [#28-12] Ex. L. Clayton listed the 183 Apartment address on both his driver's license and voter registration card, which he obtained before moving to the West Parmer Apartment. *Id.* [#28-14, -15] Exs. O, N.  In contrast, the Lynncrest House address was listed on

Clayton's health insurance card and his bank account, and the Lynncrest House was also used as his address for medical documents related to the November 11 accident.

Finally, various statements and testimony by Clayton, Sarah, and the Neumans could be interpreted to support either location being Clayton's "primary residence" in November 2011. Both Clayton and Sarah testified that the West Parmer Apartment was Clayton's primary residence at the time of the accident. *See* Clayton Dep. at 17:1–10; Weaver Dep. at 19:18–22. During an initial examination under oath and later during his deposition, Clayton's father agreed it was fair to say the West Parmer Apartment was Clayton's "primary residence" or the "principal place he would reside" given the ordinary meaning of the terms. Pl.'s Mot. Summ. J. [#38-10] Ex. J at 39:8–11. Clayton's father also agreed that although Clayton "was out on his own" and "never had plans to move back home on a permanent basis," Clayton could always "use [the Lynncrest House] as his address if he needed a permanent address." *Id.* at 39:15–23; *see also* Grover Neuman dep. at 92:7.

Grover later recanted this testimony in an affidavit filed in response to State Farm's motion, stating "[o]n November 11, 2011, and at least a few months before that, Clayton's chief, principal, and most important residences was [the Lynncrest House.]" Def.'s Resp. [#23-6] Ex. (Grover Neuman Aff.) ¶ 3.[2]  Similarly, Clayton's mother, Laura, also prepared an affidavit stating she believed Clayton's permanent address was the Lynncrest House and the Parmer Apartment was a temporary residence in which he intended to stay only while he was attending school. Def.'s Resp. [#23-9] Ex. I (Laura Neuman Aff.) ¶¶ 7, 9. Defendants also point to the Neumans' application for the Umbrella Policy on which they listed Clayton as one of the "drivers in the household," and the

---

[2] State Farm characterizes Grover's affidavit as a sham and asks the Court to disregard it in ruling upon the parties' cross-motions for summary judgment. Because the Court finds Grover's affidavit insufficient to create a fact issue with regard to Clayton's "primary residence," the Court need not consider State Farm's objections.

Umbrella Policy renewals periods, during which the Neumans did not notify State Farm that Clayton's primary residence was not the Lynncrest House. *See* Def.'s Mot. Summ. J. [#29-2] Ex. B (Umbrella Policy Application); *Id* [#29-5] Ex. E (Harper Dep.) at 79:3–12.

## III.  Procedural History

On December 15, 2014, State Farm filed the instant action seeking a declaration "that Clayton Neuman does not qualify as an 'insured' under [the Umbrella Policy] issued to Grover and Laura Neuman at the time of the automobile accident" and that State Farm therefore "is not liable for any judgment rendered against Clayton Neuman in [the Underlying Lawsuit]" under the Umbrella Policy. *See* Compl. [#1] ¶¶ 12–13.

In response, Clayton and Kirkpatrick (collectively, Defendants) each filed a counterclaim seeking a declaration "that there is coverage under the Umbrella Policy, including a duty to defend and indemnify Neuman, with respect to claims made by Kirkpatrick, individually and on behalf of the estate of her late son, Ellis McClane, against Clayton Neuman, in the Underlying Lawsuit." *See* Clayton Answer & Countercl. [#11] ¶ 10; Kirkpatrick Am. Answer & Countercl. [#26] at ¶ 10.

State Farm and Kirkpatrick filed cross-motions for summary judgment on March 10, 2016. *See* Pl.'s Mot. Summ. J. [#28]; Def.'s Mot. Summ. J. [#29].  Clayton has adopted by reference Kirkpatrick's motion for summary judgment as well as her response to State Farm's motion.  *See* Mot. Adopt. [#33].  The cross-motions for summary judgment are now fully briefed and ripe for consideration.

**Analysis**

**I.      Summary Judgment—Legal Standard**

Summary judgment shall be rendered when the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986); *Washburn v. Harvey*, 504 F.3d 505, 508 (5th Cir. 2007). A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When ruling on a motion for summary judgment, the court is required to view all inferences drawn from the factual record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *Washburn*, 504 F.3d at 508. Further, a court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 254–55.

Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact issue. *Matsushita*, 475 U.S. at 586. Mere conclusory allegations are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007). Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence. *Id.* The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence

supports his claim. *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006). Rule 56 does not impose a duty on the court to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment. *Id.* "Only disputes over facts that might affect the outcome of the suit under the governing laws will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. Disputed fact issues that are "irrelevant and unnecessary" will not be considered by a court in ruling on a summary judgment motion. *Id.* If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted. *Celotex*, 477 U.S. at 322–23.

## II.     Duty to Defend and the Eight-Corners Rule—Legal Standard

The Court has jurisdiction in this case based on the diversity of the parties and Texas substantive law therefore applies. *See Beavers v. Metro. Life Ins. Co.*, 566 F.3d 436, 439 (5th Cir. 2009); *see also Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938). In a diversity case, the Court's primary obligation is to "make an *Erie* guess as to how the Texas Supreme Court would decide the question before us." *Gilbane Bldg. Co. v. Admiral Ins. Co.*, 664 F.3d 589, 593 (5th Cir. 2011). In making the *Erie* guess, the Court may rely on "decisions and dicta of the Texas Supreme Court" as well as "decisions of the intermediate appellate courts in determine how the Texas Supreme Court would decide the issue." *Id.* Consequently, the Court must determine how the Texas Supreme Court would interpret the Umbrella Policy under Texas law.

As a general rule, courts in Texas employ the so-called eight-corners rule in order to determine whether an insurer has a duty to defend its insured in the underlying liability proceedings. *See, e.g., ACE Am. Ins. Co. v. Freeport Welding & Fabricating, Inc.*, 699 F.3d 832, 839–40 (5th Cir.

2012). The eight-corners rule mandates the court consider only two documents in determining whether an insurer has a duty to defend: the petition filed in the underlying lawsuit and the insurance policy at issue. *Id.* When reviewing these two documents, the court must assume the plaintiff's allegations in the pleadings are true and determine whether such facts fall within the scope of the insurance policy. *Id.* at 840. If the pleadings only allege facts excluded by the policy, there is no duty to defend. *Id.* Facts outside the pleadings, even those easily ascertained, are ordinarily not material to the determination, and allegations against the insured are liberally construed in favor of coverage. *GuideOne Elite Ins. Co. v. Fielder Rd. Baptist Church*, 197 S.W.3d 305, 308 (Tex. 2006). The insurer has a duty to defend if the complaint against its insured alleges facts that, if true, are potentially within the policy's coverage. *Id.* at 310.

The Texas Supreme Court has discussed with approval a "very narrow exception, permitting the use of extrinsic evidence only when relevant to an independent and discrete coverage issue, not touching on the merits of the underlying third-party claim." *Id.* This exception applies "when it is initially impossible to discern whether coverage is potentially implicated *and* when the extrinsic evidence goes solely to a fundamental issue of coverage which does not overlap with the merits of or engage the truth or falsity of any facts alleged in the underlying case." *Id.* at 309 (quoting *Northfield Ins. Co. v. Loving Home Care, Inc.*, 363 F.3d 523, 531 (5th Cir. 2004)). The parties do not dispute the exception permitting the use of extrinsic evidence applies in this case and the Court agrees both prongs are satisfied. Consequently, the Court will go beyond the eight corners of the underlying petition and the Umbrella Policy in determining whether Clayton is covered and entertain extrinsic evidence to extent such evidence does not overlap with the merits of the Underlying Suit.

### III.    Application—Duty to Defend

### 1.    Did the Parties Intend to Cover Clayton Regardless of his "Primary Residence"?

To determine whether State Farm owes a duty to defend, the Court must compare the petition in the Underlying Suit to the Umbrella Policy and determine whether the claims fall within the scope of the policy.  It is undisputed Clayton is named as a tort defendant in the Underlying Suit, but the parties dispute whether he is a covered insured under the Umbrella Policy, and therefore whether claims against him fall within the policy's scope.  According to State Farm, this inquiry depends on whether he meets the policy definition of "insured," which in turn depends on whether the Lynncrest House was Clayton's "primary residence" at the time of the accident.  Defendants frame the issue differently.  Defendants argue that under Texas law, insurance contracts must be construed in favor of the insured so long as there is *any* reasonable interpretation of the policy that favors coverage and regardless of the position taken by the insurer.  They offer four interpretations evidencing the parties intent to cover Clayton regardless of his residence and argue the Umbrella Policy must therefore be construed such that the petition in the Underlying Suit falls within its scope.

"In Texas, insurance contracts are governed by general contract interpretation rules." *Tex. Farmers Ins. Co. v. Murphy*, 995 S.W.2d 873, 879 (Tex. 1999).  Insurance contracts should be interpreted to "give effect to the written expression of the parties' intent, viewing the contract in its entirety, consistent with the applicable rules of law," and courts should "strive to give meaning to every sentence, clause, and word to avoid rendering any portion inoperative." *Id.* (internal quotation marks omitted).  "In construing the insurance policy, [Texas courts] look to the plain language of the contract, and such language will be given effect when the parties' intent may be discerned from language." *Blaylock v. Am. Guarantee Bank Liab. Ins. Co.*, 622 S.W.2d 719, 721 (Tex. 1982).

"However, when the language used is subject to two or more reasonable interpretations, the construction which affords coverage will be adopted." *Id.*

Considering these principles, the Court finds Defendants' interpretation of Texas law to be in error. Strict construction of an insurance policy against the insurer and in favor of coverage is only triggered in the presence of ambiguity, and the Umbrella Policy's definition of "insured" is clear and unambiguous. *See, e.g., Barnett v. Aetna Life Ins. Co.*, 723 S.W.2d 663, 665 (Tex. 1987) ("[I]f the insurance contract is expressed in plain and unambiguous language, a court cannot resort to the various rules of construction."); *Nat'l Union Fire Ins. Co. v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex. 1995) ("Only where a contract is first determined to be ambiguous may the courts consider the parties' interpretation . . ."); *accord Am. States Ins. Co. v. Bailey*, 133 F.3d 363, 369 (5th Cir. 1998) ("These rules favoring the insured . . . are applicable only when there is an ambiguity in the policy; if the exclusions in question are susceptible to only one reasonable interpretation, then these rules do not apply."). Indeed, the plain language of the Umbrella Policy is definite and certain; State Farm will provide personal liability coverage only for an "**insured**," and an "**insured**" is specifically defined to include "**you** and **your relatives** whose primary residence is **your** household." Umbrella Policy at 10, 14; *see also State Farm Fire & Cas. Co. v. Lange*, No. H-09-2011, 2011 WL 149482, at * 5 (S.D. Tex. 2011), *aff'd*, 480 F. App'x 309, 313 (5th Cir. 2012) ("The Court finds that 'primary residence' is unambiguous as a matter of law."); *accord Am. Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 157 (Tex. 2003) ("If policy language is worded so that it can be given a definite or certain legal meaning, it is not ambiguous . . ."). Consequently, whether claims against Clayton in the underlying suit fall within the scope of the Policy depends on whether Clayton qualifies as an

"insured," which in turn depends on whether his "primary residence" at the time of the accident was the Lynncrest House.

To the extent Texas law permits the Court to consider alternative policy constructions, the Court finds Defendants' proposed interpretations of the Umbrella Policy are neither "reasonable" nor render the policy or the specific definition of "insured" ambiguous. *See Kelley–Coppedge, Inc. v. Highlands Ins. Co.*, 980 S.W.2d 462, 465 (Tex. 1998) ("An ambiguity does not arise, however, merely because the parties advance conflicting contract interpretations."). Each of Defendants' alternative policy constructions derive from the argument the Umbrella Policy was intended to be excess personal liability insurance above the Auto Policy, and thus it would be contrary to law, the policy as a whole, and the parties' intent for Clayton to be covered under the Auto Policy but not the Umbrella Policy. Although each interpretation suffers from its own unique maladies, all four suffer from the same fatal flaw: "[w]hen an insurance policy contains defined terms, those definitions control the interpretation of the policy," and "[t]he court must rely on the policy's defined terms when construing the contract provisions to determine the true intent of the parties." *Roland v. Transamerica Life Ins. Co.*, 570 F. Supp. 2d 871, 877 (N.D. Tex. 2008) (citing *Provident Life & Acc. Ins. Co. v. Knott*, 128 S.S.3d 211, 219 (Tex. 2003)). Here, the policy definition of "insured" evinces the parties' intent to cover Clayton *only if* his primary residence at the time of the accident was the Lynncrest House.[3] Had the Neumans intended for Clayton to be covered under the Auto Policy and the Umbrella Policy without reference to his residence, they could have chosen to add him as a

---

[3] Defendants' arguments the parties intended for Clayton to be covered because he was considered an underlying exposure for purposes of calculating the policy premiums and because the Neumans paid premiums to cover Clayton are unpersuasive. Clayton *would* be covered by the Umbrella Policy if he met the policy definition of "insured,"—i.e., on the condition his "primary residence" was the Lynncrest House—and State Farm calculated and collected premiums on that basis. Therefore, the Court finds that the Neumans' premium payments do not indicate the parties' intent to cover Clayton notwithstanding the Umbrella Policy's defined terms.

Named Insured. They did not. The Court finds Defendants' alternative policy constructions unreasonable and turns to whether Clayton qualifies for coverage based on the express policy definition of "insured."

**2.      Was Clayton's "Primary Residence" the Lynncrest House at the Time of the Accident?**

To determine whether claims against Clayton in the Underlying Suit fall within the scope of the Umbrella Policy—and therefore whether State Farm owes him a duty to defend—the sole question before the Court is whether Clayton's "primary residence" at the time of the accident was the Lynncrest House. State Farm argues the evidence irrefutably establishes Clayton's primary residence was the West Parmer Apartment at the time of the accident and therefore that he is not an insured. Defendants disagree and insist Clayton was a transient college student who was temporarily residing at the West Parmer Apartment while attending school, but that his primary residence was the Lynncrest House. Viewing the evidence in the light most favorable to Defendants, and for the reasons set forth below, the Court finds Clayton's primary residence at the time of the accident was not the Lynncrest House. Summary judgment is due to be granted in favor of State Farm.

**A.      Meaning of "Primary Residence"**

In *State Farm Fire & Casualty Company v. Lange*, a factually similar case, a court in the Southern District of Texas interpreted the meaning of "primary residence" in the context of State Farm's Personal Liability Umbrella Policy. No. H-09-2011, 2011 WL 149482 (S.D. Tex. 2011), *aff'd*, 480 F. App'x 309 (5th Cir. 2012). The Court finds *Lange* instructive.[4]

---

[4] Defendant contend *Lange* is inapposite because unlike the defendant in *Lange*, who had purchased his own automobile insurance, Clayton was a named insured on the Auto Policy. Defendants argue Clayton's inclusion on the Auto Policy renders the meaning of the term "primary residence" ambiguous, thereby negating *Lange*'s application to this case. The Court fails to see the merit of this argument. For the reasons stated above, the Court refuses to read ambiguity into the Umbrella Policy on the grounds Clayton was included as an insured on the underlying Auto Policy because the plain language of the Umbrella Policy is definite and certain. The parties could have chosen to name Clayton as an insured on the Umbrella Policy but they instead decided to condition his coverage on whether his primary residence

In *Lange*, State Farm filed a declaratory judgment against defendant Matthew Lange, the driver of an automobile involved in a one-vehicle accident. 2011 WL 14982, at *1. Families of the two passengers killed in the accident intervened in the suit. *Id.* As in this case, Lange sought coverage as an "insured" under a Personal Liability Umbrella Policy held by his parents at the time of the accident, and State Farm filed suit to determine whether Lange was insured under the policy. *Id.* The terms of the policy in *Lange* were identical to those in the instant suit: State Farm agreed to cover any "insured" and an "insured" was defined to include "**you** and **your** relatives whose primary residence is **your** household," which in that case referred to the home of Lange's parents in Meyersville, Texas (the "Meyersville House"). *Id.* The dispute over Lange's residence stemmed from the fact that Lange spent the majority of his nights at an apartment in Victoria, Texas (the "Victoria Apartment") during the year leading up to the accident. *Id.* Consequently, the outcome of the case depended "entirely on which dwelling [was] found to have been Lange's 'primary residence' within the meaning of the Policy at the time of the accident." *Id.* at *4.

In addressing this issue, the court first determined the term "primary residence," which was not defined in the policy, was unambiguous as a matter of law. *Id.* at *5. The court defined "primary" to mean "first in rank or importance," "chief," or "principle," and considered a "primary residence" to be the residence that is "most important based on all relevant considerations." The court enumerated a non-exhaustive list of factors to consider in determining which residence is most important based on a totality of the circumstances:

(1)    how often a person stays at a residence;
(2)    how transient he is;
(3)    how long he has resided in a residence;
(4)    where he keeps his belongings;

---

was the Lynncrest House. This decision does not render the term "primary residence" ambiguous.

(5)     whether he lists a residence on important documents, including his "permanent address";

(6)     whether he owns or rents—and if he rents, the length of the lease;

(7)     whether he has plans, or will be required to vacate a residence;

(8)     whether he contributes to maintenance, upkeep, property taxes, or other costs;

(9)     whether he shares a residence with others;

(10)    whether blood or legal relationships exist between him and others living in the residence;

(11)    whether he has full and free access to a residence and its contents;

(12)    the subjective views of the person and the other people living in his residences.

*Id.* While no one factor is dispositive, "[w]here a person spends the majority of his time is the most important factor." *Id.* Consequently, a person's "primary residence" will generally be the dwelling in which he spends the majority of his time. *Id.*

Applying these factors, and viewing the evidence in the light most favorable to Lange, the district court held as a matter of law Lange's primary residence was the Victoria Apartment. In its analysis, the Court emphasized that Lange had stayed at the Victoria Apartment for a majority of the time during the thirteen months prior to the accident, and his stay there spanned two different jobs and time spent attending welding school. *Id.* at *6. The court also noted the Victoria Apartment's address was listed as Lange's address on a number of important documents, Lange had four months remaining on an extended lease at the Victoria Apartment, and Lange's mother viewed his move out of the Meyersville House as permanent and did not consider them to live together. *Id.* The other evidence tending to show the Meyersville House was Lange's primary residence—that he had full and free access to his parents' house, kept many of his value belongings there, he listed its address on other important documents, and he and his father testified the move to Victoria was only temporary—was "not enough . . . to overcome the stronger evidence supporting the finding that the Victoria Apartment was his primary residence, including the fact that he spent a majority of his time

-16-

there." *Id.*  Consequently, the Court concluded as a matter of law Lange was not an "insured" under his parents policy and granted summary judgment in favor of State Farm. *Id.* at *7.

On appeal, the Fifth Circuit agreed the term "primary residence" as defined in the policy was unambiguous and is "one's chief, principal, and most important residence." *Lange*, 480 F. App'x 309, 313 (5th Cir. 2012).  Considering the evidence, and stressing that Lange was an adult who had moved out of his parents' house four years before the accident, lived and worked full time in the Victoria Apartment 45 miles from the Meyersville House, and slept at the Victoria Apartment a majority of the time, the court affirmed the district court's conclusion. *Id.* at 314.

### C.    Application of the *Lange* Factors to the Facts of This Case

Applying the factors set forth in *Lange*, and considering the totality of the circumstances in the light most favorable to Defendants, the Court finds Clayton's "primary residence" at the time of the accident was the West Parmer Apartment.  Like Lange, Clayton was an adult at the time of the accident, having graduated from high school and moved out of his home almost two-and-a-half years earlier. *See Lange*, 180 F. App'x at 313.  Since leaving home, Clayton married and separated from his high school girlfriend, retained part-time custody and care of the couple's infant daughter, held a full-time job at a local pizzeria, and left his job to attend Austin Community College.  During the fifteen months preceding the accident, Clayton slept the majority of nights at the West Parmer Apartment, where he kept almost all of his belongings and every item essential for daily living. Unlike Lange, Clayton did not maintain his childhood bedroom at his parents' home and did not leave any significant or prized possessions with his parents.  Although Clayton did visit with his family at the Lynncrest House, considering the amount and nature of the time he spent there, as in

*Lange*, Clayton appears to have been a "frequent guest rather than someone who was principally residing there." *Lange*, 480 F. App'x at 313.

Additionally, at the time of the accident, Clayton had nine months remaining on his lease at the West Parmer Apartment, and there is no evidence he had any intent to move back home with his parents. Clayton did not list the Lynncrest Address on any of the important documents he filled out after leaving home, such as his driver's license, voter registration card, and employment paperwork, and chose to list the West Parmer Apartment address for purposes of his important mail. Finally, both Clayton and Sarah testified that they believed Clayton's "primary" or "principal" residence at the time of the accident was the West Parmer Apartment. Although Grover later recanted, much of his testimony also suggests he agreed Clayton's chief and most important residence at the time of the accident was the West Parmer Apartment.[5] As in *Lange*, when taken together, these factors "suggest the establishment of a new primary residence [at the West Parmer Apartment] rather than a temporary stay away from his parents' house." 2011 WL 149482, at * 6.

Defendants interpret the situation differently, arguing Clayton was a transient college student at the time of the accident and had not yet settled down in a primary residence separate from his parents and away from his childhood home. To support this theory, Defendants point to evidence of Clayton's financial dependence on his parents, his full and free access to the Lynncrest House, the short lease terms at the 183 Apartment and West Parmer Apartment, and the variations in addresses listed on Clayton's important documents. Defendants also rely on the Neumans' subjective views

---

[5] Defendants argue Sarah's views are not relevant under the twelfth factor set forth in *Lange* because she was not actually living at either the Lynncrest House of the Parmer Apartment at the time of accident. The Court disagrees. The factors set forth in *Lange* are non-exhaustive and are intended the guide the Court's inquiry; they do not prohibit the Court from considering testimony of individuals, such as Clayton's then-wife, who had unique insight into Clayton's living arrangements.

the Lynncrest House was Clayton's primary residence. The Court disagrees with this characterization of the evidence. While Clayton did maintain loose ties with his parents and had not fully left the nest, the summary judgment evidence establishes he had taken meaningful steps towards establishing his independence in a residence separate from his parents. While the Lynncrest House remained a haven for Clayton to return to in the event of a crisis, as he did after the accident, his ties to this dwelling "do not overcome the stronger evidence supporting a finding that the [West Parmer Apartment] was his primary residence, including that [sic] the fact that he spent a majority of this time there." *Lange*, 2011 WL 149482, at *6.

Viewing the evidence in the light most favorable to Clayton, the Court finds there is no meaningful factual dispute with respect to Clayton's "primary residence" at the time of the accident, which was the West Parmer Apartment. *See Lange*, 480 F. App'x 309, 313 ("When the terms of the contract are unambiguous and the facts underlying a contract claim are undisputed, whether coverage exists under the contract is a question of law."). Accordingly, Clayton does not qualify as an "insured" under the Umbrella Policy and State Farm does not have a duty to defend him under this policy in the Underlying Suit.

## IV.    Duty to Indemnify

Although an insurer's duty to indemnify often can only be resolved at the conclusion of an underlying action, it may be resolved at summary judgment when "the insurer has no duty to defend and the same reasons that negate the duty to defend likewise negate any possibility the insurer will ever have a duty to indemnify." *Farmers Tex. Cty. Mut. Ins. Co. v. Griffin*, 955 S.W.2d 81, 84 (Tex. 1997) (emphasis omitted). Here, State Farm has no duty to indemnify for the same reason it has no duty to defend: Clayton is not an "insured" under the Umbrella Policy and therefore he is not entitled

to coverage.  Having failed to present facts establishing Clayton is entitled to coverage, there is no possibility State Farm will ultimately have a duty to Clayton in the Underlying Suit, and consequently, State Farm is entitled to summary judgment with respect to the duty to indemnify.

### Conclusion

The Court concludes Clayton's primary residence at the time of the accident was the West Parmer Apartment.  Consequently, Clayton does not qualify as an "insured" under his parents' Umbrella Policy, and State Farm does not owe a duty to defend or indemnify Clayton under the policy in the Underlying Suit.  State Farm is entitled to summary judgment on each of its claims. Defendants' motion for summary judgment is denied.

Accordingly,

IT IS ORDERED that Plaintiff State Farm Fire and Casualty Company's Motion for Full and Final Summary Judgment [#28] is GRANTED;

IT IS FURTHER ORDERED that Defendant Jena Kirkpatrick, individually and as representative of the estate of Ellis McClane's Motion for Summary Judgment [#29] and Defendant Clayton J. Neuman's Motion for Summary Judgment and Response to Plaintiff's Motion for Full and Final Summary Judgment [#33] are DENIED;

IT IS FURTHER ORDERED that Clayton Neuman's primary residence on November 11, 2011, was the residence at 9801 West Parmer Lane, Austin, Texas 78717, and was not the residence at 10607 Lynncrest Cove, Austin, Texas 78726;

IT IS FURTHER ORDERED that Clayton Neuman does not qualify as an "insured" under the Personal Liability Umbrella Policy No. 93-BM-Q373-7 issued to Grover and Laura Neuman; and

IT IS FINALLY ORDERED that State Farm is not contractually obligated to defend and is not liable for any judgment rendered against Clayton Neuman in *Jena Kirkpatrick, Individually and as Representative of the Estate of Ellis McClane v. Clayton Neuman*, NO. D-1-GN-13-003023 (200th Dist. Ct., Travis County, Tex. Aug. 28, 2013).

SIGNED this the 12ᵗʰ day of May 2016.

SAM SPARKS
UNITED STATES DISTRICT JUDGE